1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
 2
    Case No. 18-mj-01138-KLM-1
 3  _____

 4  UNITED STATES OF AMERICA,

 5       Plaintiff,

 6  vs.

 7  TORREY VASHON BANKS,

 8       Defendant.
    _____
 9

10         Proceedings before NINA Y. WANG, United States

11  Magistrate Judge, United States District Court for the

12  District of Colorado, commencing at 10:35 a.m., July 30,

13  2018, in the United States Courthouse, Denver, Colorado.

14  _____

15         WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16  ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17  _____

18                        APPEARANCES

19         MARTHA PALUCH, Attorney at Law, appearing for

20  the Plaintiff.

21         ROBERT PEPIN, Attorney at Law, appearing

22  for the Defendant.

23  _____

24              IDENTITY AND DETENTION HEARING

25
```

```
 1                  P R O C E E D I N G S
 2           (Whereupon, the within electronically recorded
 3   proceedings are herein transcribed, pursuant to order of
 4   counsel.)
 5           THE COURT:  United States of America vs. Torrey
 6   Vashon Banks, 18-mj-1138.  Could I have appearances of
 7   counsel, please.
 8           MS. PALUCH:  Martha Paluch on behalf of the United
 9   States.
10           MR. PEPIN:  Your Honor, I'm Robert Pepin appearing
11   on behalf of Mr. Banks.  He is sitting closest to you in the
12   jury box.
13           THE COURT:  All right.  Good morning, Counsel, and
14   good morning, Mr. Banks.
15           Mr. Banks, you're here on an indictment out of the
16   District of Kansas.  And so I have this set for an identity
17   and detention hearing, and what I have is a waiver of a Rule
18   5 and 5.1 hearing.  Mr. Banks, you have a right to have the
19   Government prove that you are who they say you are, and by
20   executing this waiver, you are giving up that identity
21   hearing; is that right?
22           MR. BANKS:  Yes, ma'am.
23           THE COURT:  All right.  So the Court will -- the
24   record will reflect that the defendant Torrey V. Banks has
25   waived his right to an identity hearing and that we are
```

```
 1   proceeding with respect to a detention hearing today; is that
 2   right?
 3             MS. PALUCH:  Yes, Your Honor.
 4             THE COURT:  All right.  And the Government is
 5   seeking detention and, Mr. Pepin, your client is seeking
 6   release on conditions; is that right?
 7             MR. PEPIN:  That's correct.
 8             THE COURT:  Ms. Paluch, you may proceed when you're
 9   ready.
10             MS. PALUCH:  Thank you, Your Honor.
11             As the Court noted, the defendant is here.  The
12   District of Kansas is wanting him back there to face charges
13   on a firearm offense, a 922(g).  The presentence report,
14   which I would ask the Court to take judicial notice of, does
15   reference that he has four prior offenses involving firearms.
16             To start with, the risk of nonappearance, what is
17   notable are the 15 occasions where he previously has failed
18   to appear, five additional.  That is found in paragraph 6.
19   There are at least five occasions under paragraph 7 where he
20   has failed to comply with community supervision.  Paragraph 5
21   of the report talks about the criminal activity the defendant
22   has engaged in while under supervision.  Notable there is
23   leaving the scene of an accident, as well as burglary to a
24   dwelling, a felony case out of Arapahoe County.
25             I think there is substantial reason for this Court
```

1    to hold that this defendant does pose a serious risk of
2    nonappearance based on the very detailed report we have here.
3             When we get to the assessment of danger posed by
4    this defendant, his lengthy criminal history is notable is an
5    understatement.  There are eight pages in the presentence
6    report documenting 24 entries of prior criminal behavior.
7    Again, we have -- under paragraphs 4, 5, and 6 we have
8    criminal activity while under supervision, criminal
9    association, gang involvement.  We have under paragraph 7
10   history and charges involving sex offenses.  Under 8, as far
11   as violence and domestic violence, we have assault battery,
12   second degree assault.  Again, I've already noted the four
13   prior felony convictions.
14            So given this extensive criminal history, the
15   nature of that criminal history, the repeated failures to
16   appear, we would submit to the Court -- I would note also
17   that this is an (f)(1) case.  This is a rebuttable
18   presumption case given the ten-year sentence on the firearm
19   offense -- that there is simply no conditions or combination
20   of conditions that would reasonably assure the appearance of
21   this defendant, and for those reasons we are seeking that the
22   Court order be detained.
23            Thank you.
24            THE COURT:  Thank you.
25            MR. PEPIN:  Your Honor, I am asking that you

1  release Mr. Banks with conditions that would include, if the
2  Court feels it's appropriate, an ankle bracelet and release
3  so that he could go back to the home that he is living in and
4  where he is a caretaker with his father who right now is the
5  person who is in the home where he -- I mean, he's in a
6  subsidized home, housing where he is a caretaker with his
7  dad.  I'm going to ask that he be allowed to go back there
8  with conditions.
9         So let me put things into a little bit of a little
10 less frantic sort of context, and I say it for this reason.
11 There are these various prior offenses, that is for sure.  I
12 think what we have to start with, though, when we're looking
13 at, for instance, the most recent convictions that are --
14 charges against him, the ones that were alleged to have been
15 made and were alleged to have been made while he was on
16 supervision for the case that he appeared in before Judge
17 Daniel.  And those two involved that was referenced by
18 counsel, the sex assault and a burglary.  Both of those cases
19 were dismissed.  They are not convictions.
20        And Mr. Banks completed his supervision with the
21 federal authorities and was in prison for a little while with
22 the state where a couple of things happened, and here is
23 where I would like to kind of put things into the calm last
24 three-year period of time in his life that really is the
25 measure for whether or not he is, one, a danger to the

1  community, and two, a risk of flight, or a risk of
2  nonappearance.
3       So what happens is in 2015 he gets out of prison in
4  July.  While he was in prison in the state of Colorado, he
5  was diagnosed with schizophrenia, and was not only diagnosed
6  with that, but was prescribed medication to help deal with
7  that.  Since that time he gets out of prison.  He was not on
8  any kind of supervision and has not had one single problem
9  until this pops up.  And I'll talk about this and the facts
10 of circumstances with regard to this in a moment because, of
11 course, the weight of the evidence is also a consideration
12 when we're talking about the detention issue.
13      So he -- gets out of prison and he's involved with
14 basically three productive aspects of his life, apart from
15 the simple fact that he is taking care of his family.  His
16 son is in the courtroom.  He's got a son with Diedra (ph).
17 He's got a stepson who he has been the father to while -- in
18 the relationship with Diedra, and, in other words, her son.
19 So he has been supportive of -- of both of those children.
20 And he has been involved with one treatment, and so he was
21 regularly going to make sure he was on his meds to get
22 checked to see whether or not he was doing okay.  And again,
23 during that period of time has not been in trouble until this
24 thing popped up, and that's a full not quite three years when
25 the offense is supposed to have happened, this arrest in

```
 1   Kansas.
 2            He has been working.  He has been working regularly
 3   through the -- it's a temporary -- LaborMax, I believe it's
 4   called.  Is that right?  Service as a flagger, and he works
 5   as much as he can, which considering the fact he's applying
 6   for full disability from Social Security, but has only been
 7   able to get a certain amount, he is only allowed to work for
 8   20 hours a week.  And he does that in terms of that -- that
 9   quirk.  He goes, does the flagging, works in construction
10   crews, has had consistent work throughout this last two and a
11   half years of -- two to three years at this point.
12            And on top of that he has been involved with music
13   recording.  And when I say that, he is a poet and a music
14   artist.  He does performances sometimes.  He's not like out
15   running around doing drugs, playing the night life, doing all
16   that high end rap-type performance stuff.  What he is doing
17   is -- he has put together, in fact, a release called
18   Penitentiary Poetry.  It's based upon the time -- it was
19   inspired, of course, by the time that he was in prison.
20            There was a time that he had been involved in gangs
21   back in the day.  It's not part of his lifestyle anymore.  It
22   hasn't been since he got out of prison, and he has a -- he
23   has had over, what is it, 300,000 hits with regard to this
24   release of this Penitentiary Poetry release and that's on
25   Spotify and it's on -- I mean, you can see it on YouTube and
```

1   iTunes and all of that.  He isn't getting a lot of money for
2   that.  He has gotten a little bit over the years, but, you
3   know, a few hundred dollars and enough, frankly, to give him
4   encouragement with regard to that.  So he spends a lot of
5   time looking at those kinds of things.
6          So he had this three-year period of time where he
7   has been productive and solid and doing things the way we
8   would hope he would be doing.
9          So in the early part of this year he is driving --
10  driving his father from Atlanta, Georgia to Colorado, and
11  they get stopped in Kansas.  And there is -- it sounds like
12  it's a state trooper kind of stop where his license is
13  checked and the like.  Apparently he needed to do something.
14  His license may have even been at that point not in good
15  standing, but the officer said, Okay, you can go, and then
16  did the, Can I please search your car?  And Mr. -- Mr. Banks
17  said, well, no, there is no reason for you to.  And they went
18  and said we're going to give you a dog and all of that, and
19  then they asked his father to get out.
20         His father apparently had in his father's shirt
21  pocket a clip or a magazine for -- with bullets in it for a 9
22  millimeter handgun.  So the officers then had them get out.
23  They looked in the trunk.  I don't know whether that search
24  was appropriate or not, but in any event -- and there are
25  questions all along the way in terms of just whether or not

```
 1   this whole stop was, again, appropriate.  And then in a bag
 2   that apparently had both of their stuff, his and his
 3   father's, was a handgun.  It wasn't Mr. Bank's.  It was his
 4   father's.  And there was also some sort of ticket -- there
 5   was some item in the bag, which again had both of their
 6   things in it, like a receipt or something like that that had
 7   Mr. Banks' name on it and so they hit him with the charge.
 8           So that's fine.  It was a state charge, it was not
 9   a federal charge.  It is clearly an arguable, more than
10   arguable case.  I mean, he insisted it was not his gun, he
11   was not in possession of it, it was not in his control and on
12   and on.
13           He posted bond.  He put up cash money bond.  His
14   dad, in fact, put it up for him since he's the one who got
15   the charge and sort of knew where this thing was really
16   going.  Posted bond, got out, came back to the great state of
17   Colorado and waited for his next court date in Kansas.  When
18   that date was coming, he got on a Greyhound bus, he went back
19   to Kansas, he appeared in court there, and the district
20   attorney said, We're dismissing this case.
21           He had to, in fact, go to -- was it Topeka?  To
22   take the bus Topeka.  His bond person who had posted the
23   bonds for him went and picked up in a car, drove him out to
24   the little town -- I'm still not sure exactly what that --
25   name of that town is, and they went to court, and the case
```

1  was dismissed.  Said, fine, got back on a bus, came back to
2  Colorado and then he gets indicted through the feds and they
3  arrest him yesterday, or last week I guess it was, and so
4  here we are.
5         So what we have in the last three-year period of
6  time, taking all this other stuff aside, all the things that
7  have happened in his past, all the failures to appear that
8  he -- that he had, I don't understand.  He was actually out
9  of custody when he was appearing in front of Judge Daniel.  I
10 mean, that's -- so that was back in, what, 2001 or whatever
11 that was, and made all those court dates and eventually was
12 sentenced after that case was complete.
13        So what we have is a -- this -- this three-year
14 period of time when he is done with prison sentence, on his
15 medication, working, living with his family, being --
16 doing -- working, as I said for -- in basically two separate
17 areas, has this thing pop up in Kansas, does everything.  In
18 fact, the kind -- in a way that would be much more difficult
19 than for me, for instance, than simply hop in my car and
20 drive out there.  He wasn't in that situation.  Gets on a
21 bus, goes he out and makes his appearance, as he was supposed
22 to do, comes back here and, I don't know, I don't -- have not
23 heard anything about him, like, trying to run or do anything
24 else to get away from authorities here.
25        So all we're asking for, Your Honor, is this:

11

1   Release him, let him go home, leave him on ankle bracelet,
2   fair enough, he'll do that.  If need GPS, fair enough, he'll
3   do that.  This has -- was born in Colorado.  His four sisters
4   live in Colorado.  His dad lives in Colorado.  He is actually
5   his caretaker for him in his home.  His father, I would add
6   is -- I don't know if he is completely legally blind, but has
7   only sight in one eye, and as part of the whole caretaker
8   aspect of this, Mr. Banks shops for him and does other things
9   that are necessary for -- for his father.
10              And allow him to go and make his appearance in --
11  in Kansas at the date that the Kansas authorities say is
12  necessary.  I mean, it -- there -- of late, in the timeframe
13  that we really are talking about a man who is not 20 or 16 or
14  even -- even 30, is now 40 years old and has been doing the
15  right thing these last years.  We would ask that you release
16  him, Your Honor.
17              THE COURT:  All right, thank you.
18              MR. BANKS:  Can I say something?
19              THE COURT:  I think you should speak to your
20  counsel before you say anything.
21              MR. BANKS:  I already spoke with him.  He said it
22  was okay for me to speak.
23              MR. PEPIN:  Go ahead.  If the Court will let you
24  speak --
25              THE COURT:  Why don't I allow Ms. Paluch first and

1  then, Mr. Banks, you can come up.
2              MS. PALUCH:  Your Honor, when the Court is required
3  under 3142 to decide whether this defendant poses a risk to
4  the public or poses a risk of nonappearance, the standard is
5  not let's just take off the most recent good behavior and
6  ignore 30 years of a criminal history.  Even if you ignore
7  the juvenile record that's reflected in this report and you
8  start with the conduct from 1997, we're talking 30 years of
9  criminal history, we're talking 15 times when he failed to
10 appear when the Court told him to appear.
11             Now, it is -- it should be commended that he has
12 been doing well for the last three years, but I don't think
13 the standard for this Court in making the assessment is
14 limited to just the most recent conduct.  I think the Court
15 has to consider in the past has this defendant abided by the
16 rules and the conditions of the Court.
17             Also not before this Court is whether or not the
18 facts of the underlying offense were warranted or justified
19 or anything like that.  What we have is a defendant who is
20 wanted back in the District of Kansas, and what this Court's
21 assessment is, Is there any reason in this record to believe
22 that this defendant could pose a danger to the public or is a
23 risk of nonappearance?
24             And this lengthy pretrial services report cannot be
25 ignored because the defendant is doing the laudable thing in

```
 1    caring for his father and is doing the right thing in taking
 2    care of his situation so he hasn't reoffended up until the
 3    time of this offense.
 4              But when the Court considers the entire history
 5    before you with respect to this defendant, we submit there is
 6    no other ruling possible than to hold that -- that the
 7    Government -- that the defendant cannot meet his burden of
 8    proving to you that he should be released on conditions.  For
 9    those reasons, we would ask that he be remanded.
10              THE COURT:  Mr. Banks.
11              MR. PEPIN:  Your Honor, before this -- do you
12    consider this a rebuttable presumption case?  Because I'm not
13    seeing how it is.
14              THE COURT:  I don't --
15              MS. PALUCH:  It's a firearm offense with up to ten
16    years in prisonment.
17              THE COURT:  It's a 922(g).
18              MS. PALUCH:  It's a 922(g).  It is a 922(g).  It's
19    under (inaudible).
20              MR. PEPIN:  (Inaudible).  Yeah, I understand it's
21    an (f)(1), but I don't know -- that doesn't necessarily make
22    it a rebuttable presumption.  I mean, ten years, yes, if it's
23    a controlled substance offense.
24              MS. PALUCH:  (Inaudible).
25              MR. PEPIN:  Yes, but that is -- the fact is. (f)(1)
```

```
 1   does not make it a presumption -- a rebuttal presumption in
 2   and of itself.
 3           MS. PALUCH:  Yeah, (f)(1) -- if it's under (f)(1),
 4   it's rebuttable, and under (e), it says or involves the
 5   possession of a firearm.
 6           MR. PEPIN:  No.  I think if it -- my position is,
 7   that if it's (f)(1), unless it's under (e)(3), which is that
 8   which sets forth rebuttable presumption stuff, I think that
 9   it's certainly a right for the Government to have a hearing,
10   but I don't think that I have --
11           THE COURT:  I mean, Counsel, I'm going to hear from
12   Mr. Banks.  I'm going to take it under advisement.
13           MR. PEPIN:  Sure.
14           THE COURT:  I will look.  I don't -- I don't recall
15   because since 922(g)s are so common that all 922(g)s are
16   rebuttable presumption cases, but I'll take a look.
17           So Mr. Banks, what would you like to say.
18           MR. BANKS:  Well, with all due respect for your
19   authority and for the United States authority, I -- I come in
20   peace, ma'am.  I've been doing.  I wasn't medicating during
21   those years when I was young and dumb and acting frantic and,
22   you know, just making haste decisions, just not caring about
23   the results, but now I have an 18-year-old and my dad is -- I
24   just lost my mom, so my dad is the only thing I have.
25           And, you know, I mean, when it comes to a judge and
```

1  the priors being against me, you know, I really just hope
2  that the compassion that you have for now and the fact that I
3  have been doing good for three years should play a part, a
4  good part in it.
5         I just got my apartment, I have to pay rent.  I
6  just pay rent.  August 2 is when the rent is due.  I just got
7  stable.  You know, I thought everything was behind me.  I
8  have no reason to run.  I can't go nowhere.  I have nowhere
9  to go, so I'm going to fight my charges, ma'am.  I just don't
10 want to fight them from prison.
11         I lost my wife already because of this.  I already
12 lost everything.  I just need a chance, you know.  I went on
13 my own recognizance and I didn't violate.  I'm not going to
14 violate.  I have no reason to run.  It's my dad's gun, he's
15 going to take it.  They just charged me because of my prior.
16         I apologize for any inconvenience this is causing
17 anybody.  I just want to be free.  I haven't done anything,
18 and I just want a chance to prove it to Kansas, like I did.
19 I already went up there once and I'll go again.  So, you
20 know, I'm not running from you guys.  I don't -- I've been
21 dealing with this all my life, so I'm tired and I just want
22 to get it over with.
23         That's it, ma'am.  That's all I've got to say.
24         THE COURT:  All right.  Thank you, Mr. Banks.
25 Anything further from counsel?

1             MS. PALUCH:  No, Your Honor.

2             MR. PEPIN:  Not from me.

3             THE COURT:  All right.  As I indicated, I'm going

4    to take this under advisement and then either we will be back

5    for bond release hearing or we will be -- I'll issue an order

6    of detention.

7             MR. PEPIN:  Thank you, Your Honor.

8             THE COURT:  All right.  Thank you very much.  We'll

9    be in recess.

10            (Whereupon, the within hearing was then in

11   conclusion at 10:58 a.m.)

12

13                    TRANSCRIBER'S CERTIFICATE

14   I certify that the foregoing is a correct transcript to the

15   best of my ability to hear and understand the audio recording

16   and based on the quality of the audio recording from the

17   above-entitled matter.

18

19   /s/ Dyann Labo                        August 6, 2018

20   Signature of Transcriber              Date

21

22

23

24

25